IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

Case No: 1:23-cv-00185-DLH-CRH

| | | |
|---|---|---|
| JARED HENDRIX; RETIRE CONGRESS NORTH DAKOTA; LIBERTY INITIATIVE FUND; TRENTON POOL; and ACCELEVATE 2020, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | **DEFENDANTS' RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |
| MICHAEL HOWE, in his official capacity as Secretary of State of North Dakota; and DREW WRIGLEY, in his official capacity as The Attorney General of the State of North Dakota, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

***          ***          ***

## I.     INTRODUCTION

Plaintiffs have moved to enjoin enforcement of N.D. Const. Art. III, §§ 3 and 9, N.D.C.C.

§ 16.1-01-09(3), and N.D.C.C. §§ 16.1-01-12(1)(i) and (2)(a) to the extent they require initiative

petitions may only be circulated by a North Dakota elector (hereinafter "residency

requirement").   The Eighth Circuit Court of Appeals has held North Dakota's residency

requirement is constitutional.   Initiative & Referendum Institute v. Jaeger, 241 F.3d 614, 618

(8th Cir. 2001) ("there are no constitutional infirmities with the North Dakota laws requiring

petition circulators to be state residents . . ..").   Plaintiffs assert Jaeger did not consider the

argument that "North Dakota's interests can be more narrowly protected by requiring out-of-state

petition circulators to submit to the state's jurisdiction for purposes of any investigation, service

of process and/or prosecution than a blanket ban on all out-of-state petition circulators."  Docket No. 8 at 3.

As explained below, the residency requirement does not place an undue restriction on First Amendment rights and is sufficiently tailored to compelling state interests. Defendants request Plaintiffs' motion for a preliminary injunction be denied.

## II.    FACTS

On July 12, 2023, a petition regarding congressional candidate age limits was submitted to the Secretary of State for review and approval for circulation.  *Declaration of Michael Howe (Howe Decl.)* at ¶ 2.   The petition was approved for circulation on July 21, 2023.  Id.  On September 21, 2023, Plaintiffs filed their Complaint, alleging the residency requirement violates the First Amendment. Doc. 1.

In Article III, § 1 of the North Dakota Constitution, "the people" of North Dakota reserved the power to enact laws by the initiative, to approve or reject legislative acts by referendum, to propose and adopt constitutional amendments by initiative, and to recall certain elected officials.  A petition to initiate or refer a measure must be submitted to the Secretary of State for approval as to form, having been signed by twenty-five or more electors as sponsors. N.D. Const. Art. III, § 2.  Once approved as to form, an initiative petition "shall be circulated only by electors," who must swear the electors who signed the petition did so in their presence. Id. at § 3.  Initiative petitions must be signed by a sufficient number of electors and submitted at least 120 days before the election in which the initiative is to be voted upon.  Id. at §§ 4, 5, 9. Each filed petition must have an attached circulator affidavit swearing the circulator is a qualified elector.  N.D.C.C. § 16.1-01-09(3).  It is a class A misdemeanor for a person to circulate a petition when not qualified to do so.  N.D.C.C. § 16.1-01-12(1)(i) & (2)(a).

- 2 -

A detailed description of the process for initiative and referral petitions is contained in the *Declaration of Lee Ann Oliver (Oliver Decl.)* filed herewith.  *Oliver Decl.* at ¶¶ 3-7.  The laws underlying that process, including the residency requirement, are vital to prevent fraud, ensure integrity, and ensure grassroots support.  The residency requirement does not impose an undue burden on the initiative and petition process and is a necessary part of the overall process to protect North Dakota's compelling and legitimate interests.  *Howe Decl.* at ¶¶ 4-18; *Oliver Decl.* at ¶¶ 8-16; *Declaration of Benjamin Leingang (Leingang Decl.)* at ¶¶ 3-8.

The people of North Dakota have proven quite capable of initiating and referring measures.  In fact, Plaintiff Jared Hendrix has successfully chaired a sponsoring committee to place a term limits measure on the ballot as recently as the last election cycle.  *Howe Decl.* ¶¶ 4-6.  Since statehood in 1889 through the end of the 2022 election cycle, 518 measures total (including measures initiated by the Legislature) have been placed on the ballot in North Dakota. Id. at ¶ 7.  Initially, only the Legislature could initiate measures, but in 1914 "the people" of North Dakota were provided the power to initiate and refer laws.  Id. at ¶ 9.

The residency requirement was added to the North Dakota Constitution (Art. III, § 3) by the voters in 1978, and became effective in 1979.  From 1914 through the 2022 election, the people have successfully placed 53 initiated constitutional measures, 76 referred measures, and 145 initiated statutory measures on the ballot.  Id.  Of these, 20 initiated constitutional measures, 19 referred measures, and 36 initiated statutory measures have been placed on the ballot since the residency requirement was enacted.  Id.  The residency requirement has clearly not resulted in an impediment to ballot access in North Dakota.

However, it has been an integral part of the process that allows the Secretary of State to investigate and validate petitions to combat fraud and ensure integrity of the process, and enforce

violations.  *Howe Decl.* at ¶¶ 4-18; *Oliver Decl.* at ¶¶ 8-16; *Declaration of Benjamin Leingang (Leingang Decl.)* at ¶¶ 3-8.  When initiative petitions are submitted for validation, the Secretary of State has "a reasonable time, not to exceed thirty-five days, in which to pass upon the sufficiency" of an initiative or referendum petition.  N.D.C.C. § 16.1-01-10.  The residency requirement enables the Secretary of State to use available resources to investigate and detect fraud and other irregularities to ensure only valid measures are placed on the ballot.  Id.  The State has legitimate concerns about additional fraud and irregularities if the residency requirement is stricken, and the ability to discover those irregularities in the timeframe allowed to ensure integrity of the initiative process and enforce any violations.  Id.

The submission of initiative petitions often results in additional investigation where the residency requirement plays a crucial role.  As explained in the declarations of Secretary of State Howe, Election Specialist Oliver, and BCI Chief Agent Benjamin Leingang filed herewith, the investigation of petition issues involves a condensed timeline where access to local resources and individuals is crucial.  *Howe Decl.* at ¶¶ 11-18; *Oliver Decl.* at ¶¶ 8-16; *Leingang Decl.* at ¶¶ 6-8. The residency requirement prevents delays and complications that would thwart the effectiveness and timeliness of accurate verification of petitions, infecting the integrity of the entire initiative and referendum process.  Id.

Plaintiffs' assurance that they will agree to submit to North Dakota's jurisdiction is really no assurance at all.  See *Howe Decl.* at ¶¶ 14-17; *Oliver Decl.* at ¶ 15; *Leingang Decl.* at ¶ 5. Even with the residency requirement, if a nonresident circulates petitions illegally or otherwise engages in illegal practices in North Dakota, North Dakota has jurisdiction to enforce its laws against them for conduct occurring in North Dakota.  The problem is not with North Dakota's jurisdiction, it is with investigations during the condensed timeframe for validation of the

- 4 -

petition and enforcement of any violations.   Without local access and the local resources available, any delay risks an invalid petition being placed on the ballot.

The residency requirement is vital to preventing fraud, ensuring integrity of the petition process, and ensuring grassroots support.   It has already been declared constitutional by the Eighth Circuit and satisfies any level of constitutional scrutiny.

## III.   APPLICABLE LAW AND ARGUMENT

It is well-established the court is required to consider the factors set forth in Dataphase Systems, Inc. v. C.L. Systems, Inc., 640 F.2d 109, 114 (8th Cir. 1981) to determine whether a preliminary injunction should be granted.   Firearms Regulatory Accountability Coalition, Inc. v. Garland, -- F.Supp.3d --, 2023 WL 5942365, *4 (D.N.D. 2023).   In Dataphase, the Eighth Circuit set forth the following four factors for consideration: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest."   Dataphase Systems, Inc., 640 F.2d at 114.   "The burden of establishing the propriety of a preliminary injunction is on the movant."   Baker Elec., Co-op., Inc. v. Chaske, 28 F.3d 1466, 1472 (8th Cir. 1994). "No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction."   Id.   However, the Eighth Circuit has found the likelihood of success on the merits to be the most significant factor to consider in considering preliminary injunctive relief.   S & M Constructors, Inv. v. Foley Co., 959 F.2d 97, 98 (8th Cir. 1992) ("…we consider the four factors that are employed by the district court in considering preliminary injunctive relief, of which we believe the likelihood of success on the merits is most significant.").

A.      **Plaintiffs are not likely to succeed on the merits.**

As relevant here, in <u>Buckley v. American Constitutional Law Foundation</u>, the Supreme

Court evaluated Colorado laws requiring petition circulators to be registered voters.  525 U.S.

182, 186 (1999).  Following precedent established in <u>Meyer v. Grant</u>, 486 U.S. 414 (1988), the

Court explained petition circulation is "core political speech" and the First Amendment is "at its

zenith" during the interactive communication involved in petition circulation.  <u>Id.</u> at 186-87.  The

Court also recognized "there must be a substantial regulation of elections if they are to be fair

and honest and if some sort of order, rather than chaos, is to accompany the democratic process."

<u>Id.</u> at 187.  The <u>Buckley</u> Court determined Colorado's requirement that petition circulators be

registered voters was unconstitutional because it reduced "the number of message carriers in the

ballot-access arena without impelling cause."  <u>Id.</u> at 197.  The Court specifically did not decide

the issue of Colorado's residency requirement, but instead assumed it was valid.  <u>Id.</u>

After <u>Buckley</u> and <u>Meyer</u>, the Eighth Circuit evaluated the exact same provisions now

challenged by Plaintiffs.  Nothing has materially changed with respect to the relevant statutory or

constitutional provisions since the Eighth Circuit explained:

> In 1914, North Dakota's Constitution was amended, reserving the right of the
> people to initiate legislation.  In the last two decades, certain measures have been
> enacted regarding the North Dakota initiative process.  In 1979, the North Dakota
> Constitution was amended to provide that only "qualified electors" could circulate
> initiative petitions.  The North Dakota statutes define a "qualified elector" as "a
> citizen of the United States who is 18 years of age or older [and] a resident of this
> state" who has resided in the precinct for 30 days.  N.D.Cent.Code § 16.1-01-
> 04(1) (1997).

<u>Jaeger</u>, 214 F.3d at 615-16; <u>see also</u> N.D. Const. Art. III, §§ 3 & 9, N.D.C.C. § 16.1-01-04,

N.D.C.C. § 16.1-01-09(3); N.D.C.C. § 16.1-01-12(1)(i) and (2)(a) (still requiring circulators to

be residents of North Dakota and providing compliance and enforcement mechanisms without

any material change to the challenged requirement).

Similar to the present case, the <u>Jaeger</u> plaintiffs challenged the requirement that petition circulators must be North Dakota residents.  214 F.3d at 615.  Just like the present case, the <u>Jaeger</u> plaintiffs were non-profits involved in the initiative process; a for-profit business involved in qualifying proposed initiatives for the ballot; a non-resident who would like to circulate petitions in North Dakota; and a North Dakota resident who would prefer to pay petition circulators.  <u>Id.</u> at 616.  The Eighth Circuit conducted an "independent analysis as to the residency requirement's constitutionality."  <u>Id.</u>

The Eighth Circuit rejected the plaintiffs' arguments asserting the residency requirement violated the First Amendment because it increased the cost and time to collect signatures and prevented nonresidents from engaging in political speech.  <u>Id.</u> at 616-17.  The Eighth Circuit held, "As the State has a compelling interest in preventing fraud and the regulation does not unduly restrict speech, we conclude that the residency requirement is constitutional."  Id. at 616. The Court concluded "there are no constitutional infirmities with the North Dakota laws requiring petition circulators to be state residents . . .."  <u>Id.</u> at 618.  Since <u>Jaeger</u>, the Eighth Circuit has not revisited the issue and its holding remains binding precedent.

The only difference between the present case and <u>Jaeger</u> is the Plaintiffs' argument that "North Dakota's interests can be more narrowly protected by requiring out-of-state petition circulators to submit to the state's jurisdiction for purposes of any investigation, service of process and/or prosecution than a blanket ban on all out-of-state petition circulators."  Docket No. 8, p. 3. This empty assurance is inconsequential and would be ineffective in the scope of North Dakota's initiative petition provisions.  It provides no basis to preliminarily enjoin enforcement.

To evaluate Plaintiffs' claim, it is necessary to follow the framework established by the Supreme Court. The Supreme Court has explained:

> Constitutional challenges to specific provisions of a State's election laws … cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions…. Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

Anderson v. Celebrezze, 460 U.S. 780, 789 (1983) (internal citations omitted). The ultimate question is whether the regulations create undue hindrances to political conversations and the exchange of ideas. Buckley, 525 U.S. at 192; see also SD Voice v. Noem, 60 F.4th 1071, 1078 (8th Cir. 2023).

### 1.    The residency requirement is not a severe burden.

In Jaeger, the Eighth Circuit determined the residency requirement "does not unduly restrict speech." 214 F.3d at 616. The court explained all eligible voters may circulate petitions (unlike Buckley which allowed only registered voters) and the high success rate of petitions circulated "demonstrated that no severe burden has been placed on those wishing to circulate petitions." Id. The Jaeger court recognized non-residents were still free to speak to voters, train residents on the issues involved, instruct residents on collecting signatures, and could even accompany circulators. Id. The court concluded the only restriction on non-residents (collecting and verifying signatures) was justified by the State's interest in preventing fraud. Id.

The <u>Jaeger</u> analysis still applies today.  However, the evidence is even stronger that the residence restriction does not impose a severe burden.  A non-resident can freely speak on the issues involved, can donate money in support of initiatives, can use social media and other platforms of communication that did not exist or were not as prevalent at the time of <u>Jaeger</u>, can accompany circulators and engage with potential signers, can train and organize circulators, etc. In fact, Plaintiffs' declarations show the residency requirement has not restricted them from engaging in any of these types of activities.  <u>See, e.g.</u> <u>Hendrix Decl.</u> at ¶ 18 (indicating Plaintiff Retire Congress North Dakota uses nonresidents to supervise and manage petition circulators); <u>Jacob Decl.</u> at ¶ 8 (indicating Plaintiff Liberty Initiative Fund has donated $56,000 to Plaintiff Retire Congress North Dakota).  The only restriction is that signatures must be collected and verified by a resident of North Dakota who is at least 18 years old and a citizen of the United States.[1] N.D.C.C. § 16.1-01-04(1).

History proves the residency requirement has not impeded ballot access.  Since the residency requirement was effective in 1979, the people of North Dakota have successfully placed 20 initiated constitutional measures, 19 referred measures, and 36 initiated statutory measures on the ballot.  *Howe Decl.* at ¶ 9.  In fact, Plaintiff Hendrix and Declarant Owen have both recently been involved in successful petition drives.  <u>Id.</u> at ¶¶ 4-6; <u>Owen Decl.</u> at ¶ 17. There is simply no evidence the residency requirement impedes ballot access.

---

[1] There are essentially two methods to introduce laws in North Dakota.  Electors can introduce laws through the initiative petition process and legislators can introduce laws.  The requirements for an elector are less restrictive than the requirements to be a legislator.  <u>See</u> N.D. Const. Art. IV, § 5 (a person appointed to the legislative assembly must be a qualified elector from their district and a resident of the state for one year immediately prior to the election).  It cannot seriously be argued that non-residents should be allowed to be legislators, and circulators perform a collective role similar to that of a legislator proposing laws.

Yet, Plaintiffs argue the residency requirement is a severe burden on their First Amendment rights.  In support of this alleged severe burden, they assert the nonresident circulators they intend to hire are more skilled and will be able to get more signatures per hour, resulting in less cost to successfully submit the petition.  Hendrix Decl. at ¶¶ 15-20 (speculating if Retire Congress North Dakota can hire professional petition circulators they will collect 200% more valid signatures per hour, decreasing the cost by 200%); Jacob Decl. at ¶¶ 8, 12 (discussing that Plaintiff Liberty Initiative Fund has donated $56,000 to Retire Congress North Dakota and the most economical method to collect sufficient valid petition signatures is to hire the best professional petition circulators); Owen Decl. at ¶¶ 4, 17 (claiming that in prior initiative efforts it cost more to hire resident circulators to qualify the initiative for the ballot).[2]  Plaintiffs' "evidence" does not establish the residency requirement impedes their ability to engage in political speech, associate freely, or reach a sufficient number of people with their message.  Instead, they argue it costs more because skilled petition circulators do not reside in North Dakota and the residency requirement is an inconvenience due to these market conditions.

However, even if these conclusory and speculative statements were accurate, Plaintiffs do not have a First Amendment right to the least expensive or most efficient initiative process.  In Dobrovolny v. Moore, the Eight Circuit explained:

---

[2] Throughout their pleadings, Plaintiffs refer to a petition signature deadline of February 12, 2024.  See Hendrix Decl. at ¶ 8.  However, this assertion is incomplete at best.  In order to be placed on a ballot, there are several deadlines that could apply to Plaintiffs' initiated constitutional measure.  In order to appear on the ballot for the 2024 primary election, the petition must be submitted with enough valid signatures by February 12, 2024.  In order to be placed on 2024 general election ballot, the petition must be submitted with enough valid signatures by July 8, 2024.  If sufficient valid signatures are submitted by July 21, 2024, the measure would be placed on the next statewide ballot.  See Howe Decl. at ¶ 3; N.D. Const. Art. III, §§ 5, 9; N.D.C.C. § 16.1-01-09(7).

> While the Nebraska provision may have made it difficult for appellants to plan
> their initiative campaign and efficiently allocate their resources, the difficulty of
> the process alone is insufficient to implicate the First Amendment, as long as the
> communication of ideas associated with the circulation of petitions is not affected.
> As the Eleventh Circuit noted in Biddulph v. Mortham, 89 F.3d 1491, 1498 (11th
> Cir. 1996), cert denied, 519 U.S. 1151, 117 S.Ct. 1086, 137 L.Ed.2d 220 (1997),
> "Meyer does not require us to subject a state's initiative process to strict scrutiny
> in order to ensure that the process be the most efficient or affordable.  Absent
> some showing that the initiative process substantially restricts political discussion
> … Meyer is inapplicable."

126 F.3d 1111, 1113-14 (1997).

As described above, every person (regardless of residence status) can communicate and associate about an initiative petition in North Dakota in the multitude of ways available in modern times.  The only restriction is nonresidents cannot physically collect and verify signatures on initiative petitions, which is hardly a severe burden and is certainly not an undue restriction on Plaintiffs' First Amendment rights.  In fact, 20 initiated constitutional measures, 19 referred measures, and 36 initiated statutory measures have been placed on North Dakota's ballot since the residency requirement was enacted.  This success rate shows it has not created a severe burden.  Jaeger, 214 F.3d at 616-17; see also Miller v. Thurston, 967 F.3d 727, 738-39 (8th Cir. 2020) ("failing to see how" the enforcement of an in-person notarization requirement affects "the communication of ideas associated with the circulation" of the petition).

2.     The State has compelling interests.

It is well established that North Dakota has a compelling interest in protecting the integrity of its initiative process.  Jaeger, 241 F.3d at 616.  This interest is "paramount" and not simply limited to preventing fraud and corruption, but preventing mistakes such as duplicate signatures and signatures from ineligible voters.   Miller, 967 F.3d at 740 (8th Cir. 2020).

Another legitimate interest advanced by the residency requirement is ensuring grassroots support for laws affecting North Dakota residents.

> 3.   The residency requirement is sufficiently tailored to meet the state's compelling interests.

Defendants contend the residency requirement satisfies whatever level of scrutiny the Court applies.  The residency requirement does not impose a severe burden, and therefore, is constitutional if it is reasonable, nondiscriminatory and furthers an important interest.  Even if strict scrutiny applies, the residency requirement is narrowly tailored to the State's compelling interests.

Strict scrutiny does not apply to every initiative law that implicates the First Amendment. SD Voice v. Noem, 60 F.4th 1071, 1079-80 (8th Cir. 2023).

> Instead, under circuit precedent, we apply the Anderson/Burdick sliding standard. Under this standard, "we weigh the character and magnitude of the burden the State's rule imposes on First Amendment rights against the interest the State contends justify that burden, and consider the extent to which the State's concern make the burden necessary."   If [the regulation] imposes a severe burden on the ability to engage in political speech, strict scrutiny applies.  A severe burden is one that goes "beyond the merely inconvenient."  If the burden is not severe, we review the law "to ensure it is reasonable, nondiscriminatory, and furthers an important regulatory interest."

Id. at 1080 (internal citations omitted); see also Miller, 967 F.3d at 739 ("In Jaeger, for example, without referencing the Anderson/Burdick framework by name, we applied its 'sliding standard of review' to two North Dakota initiative petition laws.")

As explained above, nonresidents can engage in all forms of communication and interaction associated with the initiative process in North Dakota.  The only restriction is a resident must collect and verify the signatures (although a non-resident can certainly be present and communicate during this stage as well).  Further, history shows sponsoring committees have

been able to regularly place measures on the ballot.  As a result, the residency requirement does not impose a severe burden requiring the State to satisfy strict scrutiny.  See Jaeger, 241 F.3d at 617 ("The one restriction is that out-of-state residents cannot personally collect and verify the signatures, and that restriction is justified by the State's interest in preventing fraud."); Miller, 967 F.3d at 740 ("AVF can advertise its petition using traditional and social media and bring the sterilized petition to Allen's and Gray's homes where it can be safely transferred with little to no contact.  No doubt, the in-person signature requirement imposes real burdens.  We are just not persuaded it imposes severe burdens.  Strict scrutiny is therefore not applicable.")

In Miller, the Eight Circuit explained "states are not required to present 'elaborate, empirical verifications of the weightiness of their asserted justifications.'  They can 'respond to potential deficiencies in the electoral process with foresight …, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights.'"  967 F.3d at 740 (quoting Timmons v. Twin Cities Area New Party, 520 U.S. 351, at 364 (1997)).  While the State is not required to prove the residency requirement has promoted its interests in the past, it certainly can in this case.  There was election fraud in 1994 by nonresident circulators and issues have arisen during the validation process in the past in locating and identifying nonresidents. Howe Decl. at ¶ 12; Oliver Decl. at ¶ 12.  Further, there have been several investigations where the residency requirement has allowed ready access to circulators, ensured the integrity of the initiative process, and allowed enforcement through prosecution.  Howe Decl. at ¶¶ 4-6, 12-14; Oliver Decl. at ¶¶ 10-14; Leingang Decl. at ¶¶ 3-8. As a result, not only is the foresight behind the requirement compelling, it has proven to be legitimate.  See Miller, 967 F.3d at 740 ("And this is not to mention the fact that Arkansas has encountered fraud in the initiative process before, meaning its interest is legitimate as well as important.")

Based on its compelling interest in ensuring election integrity, the residency requirement reasonably allows petition signatures to be validated accurately in the timeframe involved without unduly burdening First Amendment rights.  It also allows North Dakota to enforce and prosecute violations.  Further, the residency requirement satisfies strict scrutiny for the same reasons.

It is vitally important (and required by law) that valid petitions are placed on the ballot. Likewise, it is vitally important (and required by law) that invalid petitions are not placed on the ballot.  When petitions are submitted for validation, the Secretary of State has a maximum of thirty-five days to review the sufficiency of petitions.  The residency requirement is narrowly tailored to the State's compelling interest in the integrity of this process because it allows the Secretary of State's office access to resident circulators to obtain information in a timely manner during the validation process.  Without local access and local resources available to pursue any investigations, the time of any sufficient investigation is increased.  As a result, the integrity and validity of the review is compromised.

While Plaintiffs claim their nonresident circulators will submit to North Dakota's jurisdiction and enforcement, this does not ensure investigations can be completed in the time allowed and is certainly no guarantee that assurance will be honored for subsequent enforcement of a violation.  See *Howe Decl.* at ¶¶ 16-17; *Oliver Decl.* at ¶ 15; *Leingang Decl.* at ¶¶ 3-8.  Any additional level of delay impacts the Secretary of State's ability to verify the sufficiency of a petition.  Id.  As a result, the residency requirement is narrowly tailored to the State's compelling interest because the alternatives suggested by the Plaintiffs do not provide adequate protection to

ensure the integrity of the process.[3]

The First Amendment guards against "undue hindrances to political conversations and the exchange of ideas." Buckley, at 192 (emphasis added). The residency requirement here results in no undue hindrance and is sufficiently tailored to meet the State's compelling interests. As a result, "there are no constitutional infirmities with the North Dakota laws requiring petition circulators to be state residents." Jaeger, 241 F.3d at 618. Accordingly, Plaintiffs are not likely to succeed on the merits of this action.

4.    Caselaw cited by the Plaintiffs is distinguishable.

Plaintiffs have cited several cases they contend support their position. Defendants will focus this response on the cases in this circuit. Plaintiffs have cited Dakotans for Health v. Noem, 52 F.4th 381 (8th Cir. 2022) for the proposition that the Eighth Circuit upheld a preliminary injunction against South Dakota's law containing a ban on nonresident petition circulators. In Dakotans for Health, the Eighth Circuit evaluated and addressed laws that imposed additional requirements for paid circulators, which is not at issue in the present case. 52 F.4th at 384-85. There is no discussion of a residency requirement in Dakotans for Health, and the only relevance it has to the pending matter is a discussion of the sliding scale standard to evaluate alleged burdens on the initiative process, which is discussed above.

---

[3] If Plaintiffs' position is accepted, not only could nonresidents be circulators, but all circulators could be nonresidents. Therefore, in any investigation of submitted petitions, every one of the most important witnesses could be located outside the state. The simple act of not returning phone calls would significantly delay an investigation of the petitions during the condensed timeframe. Without resident circulators, investigators would not be able to readily attempt to contact the circulator in person under these circumstances due to distance and jurisdictional concerns. While the nonresident circulators may agree (at the time of circulation) to be subject to North Dakota's jurisdiction, that does not extend North Dakota officials' jurisdiction to the nonresident's location. See *Howe Decl.* at ¶¶ 16-17; *Leingang Decl.* at ¶¶ 3-8.

In a more recent case, <u>SD Voice v. Noem</u> (cited above), the Eighth Circuit determined a filing deadline in South Dakota was unconstitutional and reiterated the analytical framework.  60 F.4th 1071 (8th Cir. 2023).  As discussed above, the evaluation is not a "litmus-paper test" but a case-by-case analysis.  The mere fact that an entirely different law was declared unconstitutional under the legal framework is not indicative of a constitutional infirmity with the residency requirement.  Further, <u>SD Voice</u> provides no indication of an infirmity with <u>Jaeger</u>, which was cited twice in the Eighth Circuit's decision.  60 F.4th at 1080, 1081.

Plaintiffs have also cited <u>Citizens in Charge v. Gale</u>, where the district court of Nebraska distinguished <u>Jaeger</u> from the evidence presented to it when evaluating Nebraska's residency requirement.  810 F.Supp.2d 916, 925-27 (D.Neb. 2011).  In <u>Gale</u>, the court determined sufficient evidence was presented establishing a real burden on the plaintiffs' First Amendment rights and there were less restrictive ways to meet the ability to subpoena out-of-state residents, such as a consent to jurisdiction requirement.  <u>Id.</u>  As a result, the district court declared Nebraska's statute requiring petition circulators to be residents unconstitutional.  <u>Id.</u> at 929.

There are several factors distinguishing <u>Gale</u> from the present case.  First and foremost, the decision was made after a trial and not at the preliminary injunction stage.  In the present case, Plaintiffs have offered conclusory and speculative affidavits, which do not establish any severe burden.  Plaintiffs have done this in the face of Eighth Circuit precedent (<u>Jaeger</u>) expressly declaring the exact laws at issue constitutional.  Defendants have also submitted declarations herewith establishing the importance of the residency requirement and its relation to protecting the integrity of the initiative process in the timeframe allowed.  The evidence and precedence require denial of a preliminary injunction.

Further, in <u>Gale</u> the plaintiffs contended there had been no "stateside petition effort in

- 16 -

Nebraska since the imposition of the residency requirement." 810 F.Supp.2d at 919. In North Dakota, there have been 20 initiated constitutional measures, 19 referred measures, and 36 initiated statutory measures placed on the ballot since North Dakota's residency requirement was enacted in 1979, including one successful initiated constitutional measure just last election cycle by Plaintiff Hendrix. It is clear resident circulators have been capable of qualifying petitions for ballot access, and even if petitions could be qualified with less time or cost (which is certainly disputed), the Eighth Circuit in Miller reiterated the distinction between "initiative petition laws that only make the process 'difficult' and those that affect 'the communication of ideas associated with the circulation of petitions.'" 967 F.3d at 737. The analysis/focus by the Gale court on cost and time directly conflicts with the analysis in Miller, which was decided by the Eighth Circuit nine years later. Overall, Gale is simply inapplicable as it relies heavily upon evidence and arguments different from this case, and was not appealed.

Conversely, in Constitution Party of South Dakota v. Nelson, the district court granted South Dakota's motion for summary judgment, concluding its residency requirement for political party petitions was constitutional. 730 F.Supp.2d 992, 1008-09 (D.S.D. 2010) (vacated and remanded on other grounds by Constitution Party of South Dakota v. Nelson, 639 F.3d 417 (8th Cir. 2011)). The Nelson court explained:

> Under *Jaeger*, the residency requirement for petition circulators in SDCL 12-1-3(9), even when subject to a heightened standard of review, is constitutional. There is no evidence that the Constitution Party was unable to hire sufficient numbers of circulators as a direct result of the residency requirement. The State did not bar Plaintiff Pickens from accompanying other circulators and speaking with potential voters about the candidate. Furthermore, the State's residency requirement serves the compelling interest of reducing fraud by confining petition circulators to those within the South Dakota Secretary of State's subpoena power, and no other less burdensome means are available for achieving this compelling state interest.

Id.

Plaintiffs also request the Court to rely on cases from other circuits declaring other jurisdictions' laws unconstitutional when there is actual precedent in this circuit (Jaeger) declaring the exact laws at issue constitutional. In the face of a preliminary injunction motion, the existence of circuit precedent already declaring the challenged requirement constitutional supports denial of the motion. The cases from other circuits cited by Plaintiffs certainly do not stand for the proposition that any residency requirement is unconstitutional. They merely stand for the proposition that the laws at issue in those other cases (which have numerous differences to North Dakota's initiative petition laws) were not constitutional based on the particular evidence presented. See, e.g. Pierce v. Jacobsen, 44 F.4th 853, 863 n.7 (9th Cir. 2022) ("If a state provided adequate evidence that other methods, such as consenting to jurisdiction, would be insufficient to further its interest in fraud prevention, it is possible that a residency requirement could survive.") There is no basis in the present case to grant a preliminary injunction based on other circuits' caselaw, especially when precedent in this circuit has declared the challenged provisions constitutional.

Overall, the cases from other circuits that Plaintiffs request the Court to follow involve laws dissimilar to North Dakota's petition law. Just some of the differences, as detailed above and in the *Oliver Declaration*, are: (1) Petitioners in North Dakota have a year to gather valid signatures for a constitutional measure (a longer time than the cases relied upon by Plaintiffs); (2) There is a maximum of thirty-five days for the Secretary of State to review the sufficiency of petitions (this appears to be a shorter time than the cases cited by Plaintiffs); (3) North Dakota has experienced fraud issues with out-of-state circulators; (4) North Dakota has had to investigate numerous issues in the condensed timeframe for validation, a process that would be

delayed and ineffective with nonresident circulators; and (5) enforcement of violations is hampered in cases involving nonresident circulators.  <u>See generally</u> *Howe Decl.*; *Oliver Decl.*; *Leingang Decl.*

In summary, the residency requirement does not impose an undue burden.  Further, the evidence and precedent demonstrate the residency requirement is sufficiently tailored to the State's compelling interest.  As a result, Plaintiffs cannot establish a likelihood of success on the merits and their motion for a preliminary injunction should be denied.

**B.     Plaintiffs do not face irreparable harm.**

Plaintiffs cannot establish irreparable harm for the same reasons they have not established a likelihood of success on the merits.  Plaintiffs are not irreparably harmed when no undue burden exists.  While Plaintiffs may desire to use out-of-state petition circulators, their mere assertions (without any specifics or supporting evidence besides their own conclusory statements) that out-of-state circulators are uniquely skilled and will obtain more signatures per hour are simply not sufficient to show irreparable harm.  Further, the history of success placing initiatives on the North Dakota ballot weighs against any irreparable harm and Plaintiffs' claim that resident circulators lack sufficient skills.  As recognized in Plaintiffs' brief, irreparable harm is "inseparably linked" to the likelihood of success on the merits.  *Plaintiffs' Brief* at 19.  Plaintiffs cannot establish irreparable harm because they cannot establish a likelihood of success on the merits.

**C.     The balance of equities.**

The balance of equities also does not favor preliminary relief.  In the face of precedent declaring the challenged provisions constitutional, the lack of an undue burden, additional evidence supporting the constitutionality of the residency requirement, and the history of success

of resident circulators qualifying measures for the ballot, it is not equitable to enter preliminary relief.

**D.      The public interest does not favor granting the requested injunctive relief.**

For the reasons already explained above, public interest does not favor granting preliminary injunctive relief.  The public interest in orderly, fair, and reliable elections, however, would be undermined by abruptly changing applicable law in the middle of a petition cycle. Defendants have longstanding practices and procedures in place under the law to ensure that same public interest is served, and a sudden elimination of some of those practices and procedures would open the door to confusion and loss of public confidence in the petition process and subsequent election.  The public interest would be harmed by removing requirements that allow the Secretary of State to ensure that any measure on the ballot has been appropriately validated.

**IV.      CONCLUSION**

For the foregoing reasons, Defendants request Plaintiffs' motion be denied.

Dated this 24th day of October, 2023.

By  */s/ Mitchell D. Armstrong*
  Mitchell D. Armstrong (Bar ID #05892)
  marmstrong@smithporsborg.com
  Special Assistant Attorney General
  122 East Broadway Avenue
  P.O. Box 460
  Bismarck, ND 58502-0460
  (701) 258-0630

  Attorney for Defendants Michael Howe, in
  his official capacity as Secretary of State of
  North Dakota; and Drew Wrigley, in his
  official capacity as The Attorney General of
  the State of North Dakota